## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Greater Minnesota Credit Union, a
Minnesota Credit Union,

        Plaintiff,

    v.

Federal Insurance Company,

        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 10-2345 ADM/LIB

_____

James R. Bettenburg, Bettenburg Law Firm, St. Paul, MN, and Lee A. Bernet, Lee A. Bernet
Law Office, St. Paul, MN, on behalf of Plaintiff.

Russell S. Ponessa, Esq. and Hannah E. Gallegos, Esq., Hinshaw & Culbertson, LLP,
Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

       This case involves a suit between insured and insurer over coverage under an employee

fidelity bond.  On August 2, 2011, the undersigned United States District Judge heard oral

argument on the Defendant Federal Insurance Company's ("Federal Insurance") Motion for

Summary Judgment [Docket No. 17].  Plaintiff Greater Minnesota Credit Union ("GMCU")

opposes the motion.  For the following reasons, the motion is denied.

## II.  BACKGROUND[1]

       Plaintiff GMCU is a Minnesota credit union with over 20,000 member-owners. Lee A.

Bernet Aff. [Docket No. 23] Ex. 2 ("Engblom Aff.") ¶ 2.  GMCU makes loans to its members,

---

[1] As required on a motion for summary judgment, the facts are taken in the light most
favorable to GMCU, the nonmoving party.  See Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir.
1995).

including business "floor plan" loans.   Bernet Aff. Ex. 3 ("Ahlness Aff.")  ¶ 4.[2]  Floor plan loans

allow automobile dealers to purchase inventory; the automobiles on the premises serve as

collateral for the loan, and as they are sold the amount of the loan is reduced.   Bernet Aff. Ex. 8

("GMCU Business Loan Policy") at X00281-82; Ahlness Aff. ¶ 8.

In 2003, GMCU made a floor plan loan to Trent's of Princeton, LLC, an automobile

dealership owned by credit union member Trent Snyder in Princeton, Minnesota (collectively,

"Trent's").  Ahlness Dep. at 39-40; Ahlness Aff. ¶ 8.  The loan had a one-year maturity and was

renewed or extended annually.  Ahlness Dep. at 68-70, 72; GMCU Business Loan Policy at

X00282.  To protect its security interest, GMCU inspected the vehicles monthly, as provided in

its written Business Loan Policy.  See GMCU Business Loan Policy at X00281 ("An on site

inspection and list of the dealer inventory including values will be provided to the Credit Union

monthly unless otherwise requested.")   Steven Ahlness, GMCU's president since 1978, testified

that employees are trained to conduct monthly inspections as follows: (1) by physically

inspecting and identifying the vehicles by VIN numbers; (2) by inquiring to the dealer regarding

any missing vehicles; and (3) by sending the completed inspection form to the GMCU

Commercial Loan Department.  Ahlness Dep. at 62-63; see also Russell S. Ponessa Aff. [Docket

No. 20] Ex. 3 ("Pl. Ans. to Interrogatories") at 6.  Although established in the 1980s and

followed consistently since then, see Ahlness Dep. at 55, 61, Ahlness Aff. ¶¶ 9, 10, the method

---

[2] Affidavits that contradict earlier deposition testimony may not be used to create a fact issue, unless the deposition reveals confusion or mistake and the affidavit seeks to explain or clarify the deposition testimony.  Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365 (8th Cir. 1983); Hoover v. Norwest Private Mortg. Banking, 632 N.W.2d 534, 541 n.4 (Minn. 2001).  Mr. Ahlness' Affidavit will be considered only to the extent that it seeks to explain and clarify evidence presented elsewhere in the record, and does not contradict earlier deposition testimony.

of conducting an inspection was not put in written form or made part of GMCU's written Business Loan Policy.

GMCU employee DiAnne Bean, hired in 2005, was trained to follow this unwritten inspection policy. Bernet Aff. Ex. 10 ("Bean Dep.") at 135-36. Every month she visually inspected the automobiles on the lot at Trent's, checked the VIN numbers of each vehicle against the inventory list, and regularly forwarded inspection forms to the Commercial Loan Department. Bean Dep. at 133, 137-39. Ms. Bean developed a personal friendship with Mr. Snyder. Bean Dep. at 186-88. She approved numerous financing loans to GMCU members who purchased vehicles from Trent's, including some buyers who did not meet GMCU's lending criteria. Engblom Aff. ¶ 9. Ms. Bean's husband, an automobile mechanic, also worked at Trent's. Bean Dep. at 189.

At some point while she was responsible for the Trent's floor plan loan, Bean stopped following GMCU's unwritten inspection procedure. She claims she was told by Len Misenor, then GMCU's Commercial Loan Officer, that she could merely "spot check" a few vehicles on each visit. Ponessa Aff. Ex. 6 ("Misenor Dep.") at 17, 32-33, 56. Bean began to conduct spot checks at Trent's, but – with a single exception in February 2008 – continued to report to GMCU that she had checked every vehicle. Engblom Aff. ¶ 8; Ponessa Aff. Ex. 8. Had she continued to check the VINs of each automobile, as she had originally been trained to do, Bean might have discovered that many of the cars listed on Trent's inventory had been sold and had not been replaced with new collateral.

Trent's suffered financial difficulties and in October 2008 defaulted on the floor plan loan. At this point, GMCU discovered that cars listed as collateral for its loan had been sold, and

sustained a loss in excess of $500,000.  Ponessa Aff. Ex. 19 ("Suspicious Activity Report") at

X00957.

 Unable to recover its loss from Trent's, GMCU fired Bean and sought recovery under its

employee fidelity bond ("Bond") held by Federal Insurance, alleging its loss was caused by

Bean's unfaithful and dishonest conduct.  The Bond covers "Loss resulting directly from any

Employee's failure to faithfully perform his or her duties by consciously disregarding the

ASSURED's established and enforced share draft, deposit, or lending policies."  Ponessa Aff.

Ex. 1 at 3.  The Bond does not cover loss arising from employee "negligence, mistakes or

oversights," "acts or omissions resulting directly from inadequate training," or "unintentional

violation of the ASSURED's policies or procedures."  Id. at 31.  Federal Insurance denied the

claim, and GMCU brought this action.  Federal Insurance now moves for summary judgment,

arguing that no reasonable jury could find GMCU's loss is covered by the Bond.

### III.  DISCUSSION

**A.** **Summary Judgment Standard**

 Federal Rule of Civil Procedure 56(a) provides that summary judgment shall issue "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co., Ltd.

v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court

views the evidence in the light most favorable to the nonmoving party and draws all justifiable

inferences in its favor.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere

allegations or denials but must demonstrate on the record the existence of specific facts which

create a genuine issue for trial." <u>Krenik v. County of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995)

(internal quotation omitted).

**B.      Breach of Contract**

GMCU has the burden at trial to establish the Bond covers the loss in question.  <u>See</u>

<u>Domtar, Inc. v. Niagara Fire Ins. Co.</u>, 563 N.W.2d 724, 736 (Minn. 1997).  Minnesota law

governs.  <u>See</u> <u>Murray v. Greenwich Ins. Co.</u>, 533 F.3d 644, 648 (8th Cir. 2008).  Interpretation of

an insurance policy and the existence of a duty to indemnify are questions of law for the Court.

<u>Thommes v. Milwaukee Ins. Co.</u>, 641 N.W.2d 877, 880 (Minn. 2002).  General contract

principles govern the interpretation of the Bond, and the Court's role is to ascertain and give

effect to the parties' intention.  <u>Id.</u>  The language of an unambiguous insurance policy must be

given its plain and ordinary meaning.  <u>Id.</u>  Where the policy language is ambiguous – that is,

reasonably subject to more than one interpretation – the ambiguity is "generally resolved in favor

of the insured."  <u>Id.</u>  "The sense of a word depends on how it is being used; only if more than one

meaning applies within that context does ambiguity arise."  <u>Ravich v. Datakey, Inc.</u>, Civ. No.

A05-1496, 2006 WL 923722, *2 (Minn. Ct. App. Apr. 11, 2006) (unpublished).

No Minnesota court has construed the precise language at issue here, so, in an effort to

determine how the Minnesota Supreme Court would rule, the Court may look to the law of other

jurisdictions and to dictionary definitions for guidance as to the plain meaning of certain terms.

<u>Union Pac. R.R. Co. v. Reilly Indus., Inc.</u>, 215 F.3d 830, 840 (8th Cir. 2000); <u>Ravich</u>, 2006 WL

923722, *2.

The Bond's "faithful performance" clause insures GMCU against losses resulting from

employees' "conscious disregard" of "established and enforced" lending policies, but excludes

losses caused by "unintentional violations" of those policies, including those caused by "negligence, mistakes or oversights" or "inadequate training."  Federal Insurance argues that Bean's failure to inspect the collateral, as a matter of law, was not "conscious disregard" of an "established and enforced" lending policy.  In the alternative, Federal Insurance argues Bean's conduct falls within the exclusion for "unintentional violations" caused by "negligence, mistakes, or oversights" and "inadequate training."  The question before the Court is whether a jury might reasonably find that the Bond covered the loss caused by Ms. Bean's failure to protect GMCU's collateral.

### 1.      "Established and enforced . . . lending policy"

The Bond does not define what is meant by an "established and enforced . . . lending policy."  Courts in other jurisdictions have found this language to be unambiguous, and have construed it according to its plain and ordinary meaning.  See, e.g., Mich. First Credit Union v. CUMIS Ins. Soc'y, Inc., 641 F.3d 240, 246 (6th Cir. 2011).   A written policy adopted by a credit union's board qualifies as "established."  Id.  As evidence that a policy was established, a court may also consider employee testimony that they were required to follow the policy.  Id.  By contrast, where a credit union admitted it had no criteria to determine creditworthiness, there was no "established and enforced . . . lending policy."  See U.S. Alliance Fed. Credit Union v. CUMIS Ins. Soc'y, Inc., Civ. No. 03-10317, 2009 WL 2914368, *3, 13 (S.D.N.Y. Sept. 11, 2009) (unpublished).

Federal Insurance proposes that "established" means "set up (an organization, system, or set of rules) on a firm or permanent basis," while GMCU argues "established" simply means "to institute" or "to install."  Def. Mem. [Docket No. 19] at 32; Pl. Mem. Opp. [Docket No. 24] at

17.[3]  Other relevant definitions include "to make firm or stable," "to institute (as a law) permanently by enactment or agreement," "to bring into existence," or "to bring about." Webster's New Collegiate Dictionary (1977) at 391.  Relevant synonyms include "traditional," "stable," "sure," "habitual" and "conventional."  Roget's International Thesaurus at 837 (3d Ed. 1962).  Federal Insurance also proposes that "policy" means a "high level overall plan embracing . . . general goals and acceptable procedures," and a "lending policy" means an "institution's statement of its philosophy, standards, and guidelines that its employees must observe in granting or refusing a loan request."  Def. Mem. at 32 (citing U.S. Alliance Fed. Credit Union, 2009 WL 2914368, *14).  Other relevant definitions include "a definite course or method of action selected from among alternatives and in light of given conditions to guide and determine present and future decisions."  Webster's New Collegiate Dictionary at 890.

Significantly, neither the case law nor the reference books equates "established" or "policy" with "written" or "Board-adopted."  The plain meaning of these terms does not preclude an "established lending policy" from being an unwritten plan or set of guidelines that were chosen from among alternatives to guide lending decisions and that have been used for a long time.  Accordingly, the terms are ambiguous and will be construed in favor of coverage.  If Federal Insurance desired to limit established lending policies to those that are written and Board-adopted, it was within its power to draft the Bond to include this limitation.

---

[3] GMCU cites Merriam Webster's Collegiate Dictionary 10th Edition and the Oxford Desk Dictionary, American Edition.  Plaintiff's Mem. Opp. at 17.  Federal Insurance cites the American Heritage Dictionary (3d ed. 1992), Black's Law Dictionary (8th ed. 2004), and the Online Business Dictionary, found at http:///www.businessdictionary.com.  Def. Mem. at 27, 32.

GMCU had a written, Board-adopted policy requiring that "An on site inspection of and list of the dealer inventory, including values, will be provided to the Credit Union monthly unless otherwise requested."  Although the precise requirements for conducting the inspection were not written, Bean has testified she was trained to follow a particular practice instituted by GMCU.  She has testified that she followed that practice.  Her testimony is corroborated by that of GMCU's President, who testified that the method of inspections had been in place since the 1980s.  This testimony creates an issue of material fact as to whether GMCU's vehicle inspection policy is "established" as required by the Bond.

Federal Insurance also argues there can be no dispute that the policy was not "enforced." The measures the credit union actually took to ensure the policy was followed must be examined.  Mich. First Credit Union, 641 F.3d at 246.  For example, training employees to follow the policy, appointing an employee to monitor compliance with the policy, and periodically auditing loans to reveal noncompliance, are all evidence that a policy was enforced. Id. at 246-47.  The parties also offer dictionary definitions which are largely consistent.  Federal Insurance proposes to "compel obedience of or compliance with (a law, rule, or obligation)," while GMCU proposes "to effect," "to carry out effectively."  Def. Mem. at 32; Pl. Mem. at 17.

The Court also finds the term "enforced" to be ambiguous.  It could mean disciplining an employee for failure to comply with any provision of the policy, as Federal Insurance proposes; but it could also mean setting up procedures to ensure the policy is followed – for example, that employees are properly trained and compliance with the policy is monitored and audited.  See Mich. First Credit Union, 641 F.3d at 246-47.  Obviously a lending policy need not be perfectly "enforced" as a precondition for coverage; otherwise, a violation would be both a basis for, and a

defense to, a fidelity bond claim.  If Federal Insurance desired to limit its exposure to breaches of policies that were enforced in a particular way, it had the opportunity to draft the Bond to protect its interests.  It did not do so, and the term "enforced" will be construed in favor of coverage.

The undisputed evidence shows GMCU had procedures in place to monitor compliance with its policy.  As required by GMCU, Bean submitted a monthly Inspection Report to the Commercial Loan Department stating that she had complied with the inspection policy and had inspected all the vehicles at Trent's.  All but one of her reports state that she inspected all the vehicles, even when that statement was not true, which led to GMCU's firing of Bean.  There is at the very least a question of fact as to whether the inspection policy was "enforced," and as such, summary judgment for Federal Insurance is not warranted.

### 2.   "Conscious disregard"

The term "conscious disregard" is also not defined in the Bond.  At least one court has found, in the context of fidelity bonds, that a lending policy was "consciously disregarded" when the evidence established employees were "trained on the lending policy and able to conform to its requirements," but approved loans "so clearly outside" of the policy that the court inferred "such flagrant lending errors could not have been made without consciously disregarding the lending policy."  Mich. First Credit Union, 641 F.3d at 247-48.

Federal Insurance suggests "conscious" means "having an awareness of one's environment" or "subjectively known or felt."  Def. Mem. at 27.  However, when determining intent, a court "do[es] not inquire solely into the subjective motive or purpose of the employee," but rather allows a jury to infer intent from circumstantial evidence, such as an employee's "reckless disregard for a substantial risk of loss."  First Nat'l Bank of Louisville v. Lustig, 961

F.2d 1162, 1166 (5th Cir. 1992).  "Thus, the claim by an errant employee that no loss to the bank was intended will seldom be conclusive."  Id.  GMCU's proposed definition – "aware," "knowing," "intentional" – is consistent with the plain meaning of the term.  Federal Insurance proposes that "disregard" should be understood to mean "to pay no attention or heed to; ignore."  Def. Mem. at 27.  GMCU offers "ignore," "treat as unimportant," and "neglect."  Pl. Mem. at 19.

The Court finds "conscious disregard" requires, at a minimum, that an employee must actually be aware of an established and enforced lending policy, and must deliberately choose not to follow that policy.   Like other questions of intent, the existence of "conscious disregard" may be proved by circumstantial evidence.  Bean has testified she acted in good faith and did not mean to cause a loss to GMCU.  Bean also testified that she was trained to inspect every vehicle, that she changed her procedure, and that she and her husband both had a personal relationship with Trent Snyder.  Bean may not have subjectively intended to cause a loss to GMCU, but that is not the end of the inquiry.  The issue is whether Bean intended to ignore, or not follow, an established and enforced lending policy.  GMCU has produced evidence, including Bean's own admissions and the inventory reports she filed, reflecting that she deliberately deviated from the procedure she had originally been trained to follow, and that she did not fully disclose to GMCU what she was doing.  This evidence raises a question of fact as to whether she "consciously disregarded" the policy, and as such, summary judgment is improper.

**3.      Exclusion**

Federal Insurance argues a jury would have to find the loss is excluded because Bean's violation of the lending policy was "unintentional" and caused by "negligence, mistakes, and omissions" or "inadequate training."  None of these terms are defined in the Bond.

The insurer carries the burden of proving a policy exclusion applies.  Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co., 383 N.W.2d 645, 652 (Minn. 1986).   Bean has testified she acted in good faith and did not mean to cause a loss to GMCU.  GMCU argues that Bean's subjective and possibly self-serving testimony cannot be considered in isolation, but must be viewed in the context of the facts as a whole.

Much like the fact issue raised by "conscious disregard," there is a question of fact as to whether Bean's conduct was unintentional.   The Court cannot say as a matter of law that the exclusion applies, and therefore, Federal Insurance is not entitled to summary judgment.

**C.      Estoppel**

Federal Insurance argues that GMCU has already litigated and lost the issue of whether Bean consciously disregarded GMCU's established and enforced lending policy.  When Bean was fired, she applied for unemployment insurance benefits.  They were initially denied.  Bean appealed that decision to the Minnesota Court of Appeals, which reversed, finding that Bean had not committed misconduct within the meaning of the unemployment insurance statute.  Bean v. Greater Minn. Credit Union, Civ. No. A09-888, 2010 WL 1029581, *3.  The court determined Bean had committed no "intentional, negligent or indifferent conduct" that would render her ineligible for benefits under Minn. Stat. § 268.095 subds. 4(1) and 6(a), but had made a "judgment error" in "good faith."  Id. *2-3.   Federal Insurance argues the Court of Appeals' determination precludes GMCU from re-litigating before this Court the issue of whether Bean's conduct was intentional or negligent.

Collateral estoppel is appropriate where (1) the issue is identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party to

the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.  See State v. Lemmer, 736 N.W.2d 650, 659 (Minn. 2007). Federal Insurance argues all factors apply here.  GMCU disagrees, arguing it was merely a nominal party in Bean's unemployment insurance appeal, the issues were different, and it did not have a full and fair opportunity to be heard.

The Court agrees with GMCU.  Bean's unemployment insurance claim challenged a decision of the Minnesota Department of Employment and Economic Development ("DEED") that she was not eligible for benefits.  The issue before the DEED and the Court of Appeals was whether Bean's conduct disqualified her from receiving unemployment insurance benefits, not whether her conduct caused a covered loss under the Bond.  GMCU had no opportunity in that proceeding to litigate coverage under the Bond, and it would work an injustice to preclude it from doing so now.  Collateral estoppel does not apply to preclude GMCU from litigating whether Bean's conduct was intentional.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 17] is **DENIED.**

BY THE COURT:

_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 15, 2011.